Rachel E. Kaufman (CSB# 259353)
KAUFMAN P.A.
237 S Dixie Hwy, Floor 4
Coral Gables, FL 33133
Telephone: (305) 469-5881
Email: rachel@kaufmanpa.com

*Counsel for Plaintiff and the putative Classes*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN KERN, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>UMRO REALTY CORP. d/b/a The Agency, a California corporation,<br><br>*Defendant.* | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

**CLASS ACTION COMPLAINT**

This case addresses The Agency, a real estate brokerage that systematically ratifies and facilitates its agents' unlawful telemarketing practices, allowing agents to cold call consumers without consent using the company's name, branding, and infrastructure in violation of the Telephone Consumer Protection Act ("TCPA"). Plaintiff Steven Kern ("Plaintiff" or "Kern") brings this class action against Defendant UMRO Realty Corp. d/b/a The Agency ("Defendant" or "The Agency")

to stop its unlawful telemarketing practices, including unsolicited calls made using pre-recorded voice messages and unsolicited calls that are being placed to phone numbers that are registered on the National Do Not Call Registry (“DNC”). These calls are not isolated or rogue; they are made using The Agency’s name, branding, and infrastructure, and are encouraged, ratified, or facilitated by the company. Plaintiff seeks statutory and injunctive relief on behalf of himself and classes of similarly situated individuals. The allegations set forth below are based on personal knowledge as to Plaintiff’s own experience and on information and belief as to all other matters, following investigation by counsel.

## PARTIES

1. Plaintiff Kern is a resident of Los Angeles, CA.

2. Defendant UMRO Realty Corp. d/b/a The Agency ("UMRO" or "The Agency") is a California corporation with its principal place of business in Beverly Hills, California. UMRO is a real estate brokerage doing business as "The Agency." Defendant conducts business throughout this District and the US.

3. At all times relevant to this action, The Agency was the broker of record and responsible broker for Joey Parsi ("the Agent"), a real estate salesperson who made the unlawful calls and text messages to Plaintiff described herein.

## JURISDICTION AND VENUE

4. This Court has federal question subject matter jurisdiction over this action under 28 U.S.C. § 1331, as the action arises under the Telephone Consumer Protection Act, 47 U.S.C. §227.

5. This Court has personal jurisdiction and venue is proper since Defendant has its headquarters in this District and the wrongful conduct giving rise to this case was directed from this District and into this District where the Plaintiff resides.

## INTRODUCTION

6. As the Supreme Court explained at the end of its term this year, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back." *Barr v. Am. Ass'n of Political Consultants*, No. 19-631, 2020 U.S. LEXIS 3544, at *5 (U.S. July 6, 2020).

7. When Congress enacted the TCPA in 1991, it found that telemarketers called more than 18 million Americans every day. 105 Stat. 2394 at § 2(3).

8. By 2003, due to more powerful autodialing technology, telemarketers were calling 104 million Americans every day. In re Rules and Regulations Implementing the TCPA of 1991, 18 FCC Rcd. 14014, ¶¶ 2, 8 (2003).

9. The problems Congress identified when it enacted the TCPA have only grown exponentially in recent years.

10. According to online robocall tracking service "YouMail," 4.5 billion robocalls were placed in June 2025 alone, at a rate of 148.8 million per day. www.robocallindex.com (last visited July 10, 2025).

11. The FCC also has received an increasing number of complaints about unwanted calls. FCC, Consumer Complaint Data Center, www.fcc.gov/consumer-help-center-data.

12. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), statement of FCC chairman.[1]

13. "The FTC receives more complains about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone*

[1] https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls

*Consumer Protection Act of 1991,* Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016).[2]

## COMMON ALLEGATIONS

### I. Legal Standards for Vicarious Liability Under the TCPA

14. Vicarious liability for TCPA violations may be established through three theories of agency: (1) actual authority, (2) apparent authority, and (3) ratification.

15. Actual authority exists when a principal manifests to an agent that the agent has the power to act on the principal's behalf. Actual authority may be express or implied.

16. Apparent authority exists when a principal's direct or indirect manifestations to a third party give that party reason to believe that the principal has authorized the agent to act on the principal's behalf.

17. Ratification occurs when a principal, with knowledge of an agent's unauthorized acts or willful ignorance, accepts or retains the benefits of those acts or otherwise manifests acceptance of the agent's conduct.

18. A principal may be held vicariously liable under the TCPA when the principal knew, or should have known, of its agent's violative conduct but failed to

[2] https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf

take action to stop such conduct and instead benefited from the results of that conduct.

**II. The Agency Trains, Direct, and Controls Its Agents' Cold Calling Practices**

19. The Agency provides extensive infrastructure to train and support agents in cold calling, including "Agency University," an internal portal with videos, webinars, and live coaching; a week-long intensive onboarding program; and weekly mentorship sessions.

20. The Agency's CEO, Mauricio Umansky, is personally involved in agent development and often instructs agents on the importance of cold calling.

21. Netflix's "Buying Beverly Hills" is a reality television series about Defendant The Agency.



22. The show features The Agency's offices, leadership, and agents, with CEO Mauricio Umansky and founding partners appearing prominently throughout multiple episodes discussing business operations and lead generation methods. Multiple episodes document The Agency's cold calling culture and CEO Umansky's direct involvement in promoting it.

23. In the second season of the show, when The Agency agent Sonika Vaid failed to generate business, CEO Mauricio Umansky placed her under performance review and directed her to cold call, scheduling a follow-up meeting and stating: "What you really need is to create lead generation... Let's meet again in three weeks. I want you to show me what you've done. Are you making calls? What are you doing to generate leads?"



24. At the follow-up meeting, Sonika Vaid explicitly reported: “So I was cold calling, too” and stated she had made 115 calls over four weeks. CEO Umansky

responded with approval “Wow. So in four weeks, you've accomplished three leads” and demanded continued progress: “In three weeks, I want to see the next progress.” In a camera interview, Mauricio Umansky warned “But at the end of the day, if she can't start selling, we may have to look at letting her go.” This exchange demonstrates The Agency's CEO ratifying cold calling by struggling agents and tying employment outcomes to lead generation activity.

25. In another episode filmed at The Agency's office, Tyler Hill—a member of Ben Belack's team at The Agency conducts a cold calling training session for Sophia Umansky (Mauricio Umansky’s daughter) and other agents including Sonika Vaid, the agent under CEO performance review by Mauricio Umansky. Before any calls are made, Tyler Hill warns the trainees: "Be prepared for people to cuss us out on the phone." This statement, made openly on camera, demonstrates The Agency's knowledge that these cold calls are unwanted by recipients and will provoke hostile reactions. Despite this explicit acknowledgment that the calls lack consent, the training proceeded.

26. Tyler Hill asks agent Sonika Vaid about her experience with cold calling. Sonika responds: “It scares the crap out of me.” Despite this admission that Sonika Vaid lacks experience and is uncomfortable with cold calling, Tyler Hill proceeds to train her and Sophia Umansky on cold calling.

27. Sophia Umansky then makes actual cold calls on camera using The Agency's name and script, with Tyler and Sonika providing encouragement and positive reinforcement after the calls.



28. The Agency ratified and authorized cold calling as an accepted business practice by: (1) arranging for the CEO's daughter to participate in cold calling training, (2) had her trained by a member of the team whose team leader openly sells courses and trains its own agents on cold calling, (3) allowing the training to proceed despite warnings that "people will cuss us out," (4) including the agent under CEO performance review in the same training to satisfy the CEO's "generate leads" mandate, and (5) filming and broadcasting this training to millions of viewers. These actions demonstrate that cold calling is not rogue behavior but rather an authorized and actively promoted business practice that The Agency openly facilitates.

29. At The Agency's official annual event hosted by CEO Mauricio Umansky, Santiago Arana—a Principal, Partner, and Managing Partner of The Agency's Brentwood and Pacific Palisades offices—addressed the audience of agents, stating: "So you need to start scheduling what? Door knocking, cold calling." This statement by a founding Partner at an official company event with the CEO present demonstrates The Agency's ratification and promotion of cold calling at the highest levels of leadership.




30. Arana's public promotion of cold calling extends beyond internal events. In an article published on inman.com entitled "Do you have thick skin? 5 obstacles new agents face," Arana writes: "As a real estate agent, you will have to cold call a lot of people, a tactic that requires a lot of patience and the ability to handle rejection. Cold calling is crucial as you immerse yourself in real estate and is a way to let the community know that you are now a licensed real estate expert."

Arana was rewarded for his production with a founding partnership role at The Agency.

> **Learning to sell yourself**
>
> As a real estate agent, you will have to cold call a lot of people, a tactic that requires a lot of patience and the ability to handle rejection. Cold calling is crucial as you immerse yourself in real estate and is a way to let the community know that you are now a licensed real estate expert. [3]

31. In the second season of “Buying Beverly Hills, there is a meeting between CEO Mauricio Umansky and Principal, and Managing Partner Santiago Arana, the two leaders discuss increasing the Umansky team's production volume. CEO Mauricio Umansky explicitly identifies the solution: "Ben [Belack] has a lot of skills that could complement Farrah, Alexia, and Sophia [Umansky] that they don't do. You know, the cold calling, the lead generation. I need that rainmaker." Mauricio Umansky and Santiago Arana then immediately call Ben Belack into the office to discuss a potential team merger.

---

[3] https://www.inman.com/2022/04/27/how-thick-is-your-skin-5-challenges-newbies-need-to-deal-with-today/



32. In discussing the potential merger with Belack, CEO Umansky states: "I want to increase the volume of the Umansky team, and I think that there's an opportunity where we can mutually benefit, you know, each other" and confirms that the merger would help because "it definitely could fill that gap." In a camera interview, Umansky states: "Ben is really stepping up his game. I love what he's doing."

33. This exchange between two of The Agency's founding partners—CEO Umansky and Principal and Managing Partner Arana—demonstrates that The Agency makes strategic business decisions at the highest levels of corporate leadership based on agents' cold calling capabilities, treating cold calling as a core business function rather than independent contractor activity.

34. At a The Agency celebratory dinner following a major real estate sale to a celebrity couple, founding Partner Santiago Arana discussed the deal with

multiple Agency agents, including CEO Mauricio Umansky. Arana stated: “So we went door knocking in Pacific Palisades, and we ended up in Ben's house.” Senior Agent Ben Belack responded: “Prospecting works.” Arana confirmed: “Of course. Go back to the basics. You gotta go out there and work. You need to door knock, you need to cold call.” This exchange demonstrates The Agency's ratification and endorsement of cold calling by senior leadership.

**III. The Agency Holds Out Its Agents as Official Representatives**

35. Consumers receiving cold calls from The Agency's agents are led to believe they are dealing directly with the company.

36. Agents routinely identify themselves as representatives "with The Agency" and use company branding, including its name, logo, and slogans, in phone calls, voicemails, and online marketing content.

37. For example, The Agency agent Joey Parsi who called the Plaintiff twice, introduced himself as a real estate broker "here at The Agency" and referenced the company’s Netflix reality series, “Buying Beverly Hills,” while invoking the names of well-known The Agency agents and executives such as Mauricio Umansky and Santiago Arana.

38. The Agency’s branding is used extensively in its agents' marketing, including LinkedIn profiles, coaching programs, podcasts, and social media posts. Consumers are not informed that these individuals may be technically independent

contractors. Instead, The Agency permits its agents to operate under its name and holds them out as unified members of its corporate team, thereby creating the reasonable impression that all such communications originate from The Agency itself.

## IV. The Agency's Commission Structure Creates Direct Financial Benefit

39. Defendant The Agency operates a luxury real estate brokerage built around a commission-based compensation model. Its agents earn money solely from successful transactions, while The Agency takes a percentage of each agent's commissions through revenue splits ranging from 70/30 to 90/10, in addition to collecting a 6% franchise or royalty fee and fixed monthly office fees. This model ensures that The Agency benefits financially from every deal closed by its agents, regardless of how the lead was generated.

40. This structure creates strong economic incentives for The Agency to promote high-volume lead generation activities, including outbound telemarketing and cold calling. As a result, cold calling is not a side tactic, but a fundamental part of Defendant's business model. The Agency encourages this behavior through training programs and by promoting and rewarding agents who generate leads through cold outreach.

## V. Ben Belack and Active Facilitation Through "The Cold Call Coach"

41. Senior Agent and Director of Defendant The Agency Ben Belack publicly brands himself as "The Cold Call Coach" on social media (@thecoldcallcoach), describing his services as "Helping real estate agents master cold calling, follow-up, and operations."




4

42. In The Agency's Netflix series "Buying Beverly Hills," Ben Belack instructs a group of The Agency agents on cold calling practices, stating: "Phone calls are what get you an appointment, and appointments are what get you business.

[4] https://www.instagram.com/thecoldcallcoach/

You could prospect for two hours a day and change your life." This instruction was filmed at The Agency's offices and broadcast on Netflix with company authorization, demonstrating The Agency's systematic promotion of cold calling as the primary method for generating business.




43. In another scene from "Buying Beverly Hills," The Agency agent Zach Goldsmith and Ben Belack are shown setting up for a podcast. Goldsmith says to Belack “Is that how you make your cold calls? You hold it this close: Hi, is this Rick? Do you own 2730?" Belack responds: "Speaking of Rick..." This exchange demonstrates that cold calling is so normalized within The Agency's culture that agents openly discuss and mimic other agent’s cold calling techniques on camera. Goldsmith's familiarity with Belack's cold calling script—including the use of

property addresses to identify targets—demonstrates that these practices are common knowledge among The Agency's agents.

44. CEO Mauricio Umansky explicitly seeks to acquire Belack's calling capacity. In a filmed meeting with founding Partner Santiago Arana, CEO Umansky states: "Ben has a lot of skills that could complement Farrah, Alexia, and Sophia that they don't do. You know, the cold calling, the lead generation. I need that rainmaker." CEO Umansky describes Belack's cold calling capabilities as skills that would "fill that gap" in production. The CEO's decision to merge his team with an agent who brands himself as "The Cold Call Coach" demonstrates knowledge and intent to replicate high-volume cold calling practices.

45. In a video interview published on June 5, 2025 on the Luxury Presence YouTube channel, Belack publicly describes his systematic cold calling practices. Belack states: "We do a lot of prospecting of expired and canceled listings on my team. This is widely known."[5] Expired and cancelled listings refer to homeowners who previously listed with competing brokerages, consumers with whom The Agency has no relationship and from whom no consent was obtained. Belack acknowledges that "these prospects are getting calls at 7.30 in the morning and in the hundreds and across days."

---

[5] https://www.youtube.com/watch?v=NtC6KZ8pXB0

46. Belack describes his daily training regimen: "We do [role play] every day at 7.45 in the morning for 15 minutes. And then we hop on our dialer and we do the hardest part every morning."[6] Belack explains he created "a flow chart where agents on my team can start with the flow chart" for calling prospects, demonstrating systematic scripting and methodology. He describes his coaching results: "I've had agents role play for a week. And on that first Friday, they're setting appointments." Belack acknowledges: "Agents say they don't want to make calls because they don't know what to say" demonstrating that training programs provide agents with scripts and techniques to make calls they would not otherwise make.

47. Belack actively markets and sells a cold calling course while serving as Senior Agent and Director of The Agency. In Instagram posts under his account "benbelack and thecoldcallcoach," Belack promotes his course by stating: "I get asked all the time when I'm going to release my cold calling course - and it's almost here." Belack explains: "I used to have to door knock, waste money on postcards, and bug my database, hoping to make money. Now, people can read and hear the actual words I use to set listing appointments of expired/cancelled listings anytime I pick up the phone." Belack describes the course as "an intimate, in-depth walk-through of my entire process, not just scripts and dialogs, and how I turn my words

[6] *Id.*

into customers (from cold-call to high value commissions)."[7] Belack took "6 months to create this course" and markets it with escalating pricing designed to create urgency.




48. Alexia Umansky, the daughter of Mauricio Umansky, publicly endorses Belack's coaching programs through social media. By having the CEO's daughter endorse programs from an agent who brands himself as "The Cold Call Coach" and sells a course called "Turn Calls Into Cash," The Agency demonstrates institutional support for cold calling at the highest leadership levels.

[7] https://www.instagram.com/p/DQR29WUCdDi/



[8]

49. The Agency's involvement extends beyond ratification to active facilitation. The Agency employs agents who publicly brand themselves around cold calling, has its CEO explicitly seek to acquire high-volume calling capacity ("I need that rainmaker... the cold calling... fill that gap"), and has the CEO's daughter endorse coaching programs teaching expired listing cold calling. When the CEO seeks "the cold calling" from an agent who brands himself as "The Cold Call Coach," makes 100,000 calls per year, and sells a course called "Turn Calls Into Cash" teaching "ethical persuasion hacks" to achieve "seven-figure GCI," the CEO demonstrates knowledge of exactly what practices he is acquiring. The Agency

[8] https://www.instagram.com/p/C-VuekVyx7i/

systematically facilitates and promotes cold calling training rather than merely ratifying it after the fact.

## VI. The Agency Maintains a Nationwide Pattern and Practice of Cold Calling

50. The cold calling described in this case is not isolated to one office or individual. Rather, it is a company-wide norm across The Agency's national footprint. Agents from California to Florida publicly describe cold calling as part of their job responsibilities.

51. LinkedIn profiles, Instagram videos, and promotional posts routinely depict The Agency agents engaged in live cold calling sessions.

52. For example, Florida agent David Rocca frequently posts cold calling content that is liked and shared by The Agency's regional accounts and affiliated agents.



[9]

[9] https://www.instagram.com/reel/DGdqaiXOIib/



[10]

53. Julie Bernstein and Rae McKee have listed cold calling under their job duties on professional profiles.

54. The Agency website advertises a podcast from James Harris and David Parnes entitled – Rise Above the Ranks. As per the website, the podcast covers topics that include cold calling:



[11]

---

[10] https://www.instagram.com/p/DAbPXQvuhxI/
[11] https://blog.theagencyre.com/tyler-whitmans-checklist-for-a-successful-real-estate-agent/

55. Cassie French, a The Agency agent located in California regularly posts about cold calling through her social media channels and even references it in her Linkedin profile:



[12]



[13]

[12] https://www.youtube.com/shorts/bulK9VjjpnY
[13] https://www.linkedin.com/in/cassie-french-realtor/

56. These examples reflect a systemic practice of cold calling built into the company's operational DNA, encouraged and accepted by its leadership and institutional structures.

## VII. The Calls Received by Plaintiff Kern Exemplify The Agency's Practices

57. The 2 unsolicited voicemails that Plaintiff Steven Kern received were from real estate agent Joey Parsi. In the voicemails, Parsi identifies himself as a broker "here at The Agency" and promotes the company's Netflix show and its high-profile agents. He made generic sales pitches to see if Plaintiff was interested in selling his home off-market and referenced working with other buyers in the area.

58. The voicemails were both clearly pre-recorded. They began with a short period of silence, lack any personalization, and last approximately 2-3 minutes. Both were plainly scripted, using the same promotional language and tone seen in The Agency's public-facing content.

59. Plaintiff Kern has never provided his phone number to The Agency, nor has he given consent to receive calls from them. These calls were not anomalies, but the predictable result of The Agency's top-down strategy of encouraging high-volume cold calling by its agents to generate listings, drive transactions, and boost company revenue.

60. As such, The Agency is liable not only for the calls that Plaintiff Kern received, but for similar unsolicited calls made to members of the putative classes

under well-established principles of apparent authority, actual authority, and ratification.

**VIII. California Law Imposes Non-Delegable Supervisory Duties on Real Estate Brokers**

61. Under California Business & Professions Code § 10177(h), the California Department of Real Estate may suspend or revoke a broker's license for failing to "exercise reasonable supervision over the activities" of salespersons licensed to the broker.

62. California Code of Regulations, title 10, § 2725 requires that "a responsible broker shall exercise reasonable supervision over the activities of their salespersons." This duty expressly extends to "(e) Advertising of any service for which a license is required," which includes telemarketing and solicitation activities.

63. California Business & Professions Code § 10032(a) prohibits brokers from avoiding supervisory responsibility by classifying agents as independent contractors. The statute provides: "All obligations created under Section 10000, and following, all regulations issued by the commissioner relating to real estate salespersons, and all other obligations of brokers and real estate salespersons to members of the public shall apply regardless of whether the real estate salesperson and the broker to whom he or she is licensed have characterized their relationship as one of 'independent contractor' or of 'employer and employee.'"

64. As the broker of record for Joey Parsi and all other agents operating under "The Agency" brand, Defendant had a non-delegable duty under California law to supervise Parsi's telemarketing activities, including the unlawful prerecorded calls to Plaintiff Kern.

## IX. The Agency Is Vicariously Liable for TCPA Violations by Its Agents

65. As established above, Defendant The Agency had a non-delegable duty under California law to supervise its agents' telemarketing activities. This duty applies regardless of whether agents are characterized as independent contractors. Cal. Bus. & Prof. Code § 10032(a).

66. The Agency is vicariously liable for TCPA violations committed by agents operating under "The Agency" brand, including but not limited to Joey Parsi, under three independent theories: (1) ratification, (2) actual authority, and (3) apparent authority.

### A. Ratification

67. The Agency ratified its agents' cold calling practices through the conduct of CEO Mauricio Umansky and senior leadership.

68. CEO Umansky had knowledge that The Agency's agents engage in cold calling. He directed agent Sonika Vaid to cold call (¶23), approved her report of making "115 calls" (¶24), and sought to acquire Ben Belack's team specifically for "cold calling" and "lead generation" capabilities (¶¶31-33). The cold calling training

included warnings that "people will cuss us out on the phone" (¶25), demonstrating knowledge that recipients had not consented to these calls.

69. CEO Umansky and senior leadership explicitly approved cold calling as company practice. CEO Umansky responded "Wow" when Vaid reported making 115 calls and demanded continued progress (¶24). Partner Santiago Arana instructed agents at an official company event to engage in cold calling (¶29) and again endorsed the practice at a company dinner with CEO Umansky present (¶34). The Agency filmed and broadcast this material to millions of viewers on Netflix (¶¶23-30).

70. The Agency benefits financially from all transactions generated through cold calling via its commission structure with its agents (¶¶41-42).

71. Despite knowledge of widespread cold calling by agents throughout the organization, The Agency took no corrective action. Instead, CEO Umansky and senior leadership actively encouraged, promoted, and rewarded the practice.

**B. Actual Authority**

72. The Agency granted its agents actual authority to engage in cold calling through systematic training, direct CEO orders, company policy, and strategic business decisions.

73. The Agency provides "Agency University" training, onboarding programs, and mentorship focused on lead generation (¶19). The Agency conducted

cold calling training at its offices teaching a standardized script using "The Agency" name (¶¶25-28). CEO Umansky directly ordered agents to cold call (¶23). Partner Arana publicly instructed agents to cold call at official company events (¶31). CEO Umansky made business decisions, including whether to promote or terminate agents, based on agents' cold calling capabilities

74. These manifestations of authority apply uniformly across The Agency's agents and demonstrate that The Agency authorized cold calling as an essential business function.

**C. Apparent Authority**

75. The Agency cloaked its agents with apparent authority by permitting and encouraging them to identify themselves as representatives "with The Agency" or "here at The Agency" when making cold calls.

76. The Agency permits agents to use its name, branding, and trademarks in connection with cold calling. Agents extensively use The Agency branding in their marketing and lead generation activities. The Agency features high-volume cold callers like Ben Belack (100,000 calls per year) prominently in its operations (¶42).

77. Agent Joey Parsi's voicemail to Plaintiff Kern exemplifies how The Agency's agents hold themselves out using company credentials: identifying as "a real estate broker here at The Agency," referencing "our show Buying Beverly Hills

on Netflix," and invoking CEO Mauricio Umansky's name along with other senior agents (¶76). This use of company assets and leadership credibility is standard practice across The Agency's agent population.

78. Consumers receiving calls from individuals who identify themselves using The Agency's name, reference its Netflix show, and invoke its leadership reasonably believe they are dealing with authorized representatives of the company.

**D. Independent Contractor Status Does Not Defeat Liability**

79. The Agency cannot avoid vicarious liability by characterizing its agents as independent contractors. California Business & Professions Code § 10032(a) provides that broker supervisory obligations "apply regardless of whether the real estate salesperson and the broker to whom he or she is licensed have characterized their relationship as one of 'independent contractor' or of 'employer and employee.'"

80. The Agency's systematic training, direct CEO orders, company-wide policies promoting cold calling, strategic business decisions rewarding cold calling, and authorization of Netflix content depicting cold calling demonstrate a level of control and authorization that establishes vicarious liability for TCPA violations by any agent operating under The Agency brand.

## PLAINTIFF KERN'S ALLEGATIONS

81. Plaintiff Kern is the subscriber and sole user of the cell phone number ending with 4002.

82. Plaintiff Kern registered his cell phone with the DNC on July 27, 2003.

83. Plaintiff Kern uses his cell phone as a residential phone number.

84. Plaintiff Kern uses his cell phone to make residential calls to friends and family, and to schedule personal appointments.

85. Plaintiff Kern does not hold out his cell phone number to the public on behalf of, or related to any business.

86. Plaintiff's cell phone number ending in 4002 is a private, residential phone number.

87. On July 7, 2025 at 1:17 PM, Plaintiff Kern received an unsolicited call to his cell phone from 310-780-0770.

88. This call was not answered, but a pre-recorded voicemail was left stating:

"Hi guys, this is Joey Parsi. I'm a real estate broker here at The Agency, here in the Beverly Hills offices, of Brentwood offices. Hopefully you've seen our rent for sale signs all over the neighborhood in Beverly Hills, Bel Air, Brentwood. Hopefully you've seen our show Buying Beverly Hills on Netflix that's currently streaming. Anyway, the reason for my call is that I am working with several clients who happen to be your neighbors and these clients have been looking to purchase another home in the area, in your area, in your pocket, and they have tasked me with calling individual home owners like yourself to see if you considered or have thought about selling in the past. If so, we would love to speak with you and feature your home as a pocket listing and see if we can just look at the sale for you off-market. I work with some of the most successful agents in the country including Santiago Arana, Mauricio Umansky, Billy Rose, Blair Chang, Marco Rufo who together are amongst the best of the best, and we represented the most iconic, the most high-end properties in Los Angeles, including for some of the biggest celebrities, biggest business leaders and obviously some of your very own neighbors. Anyway, we specialize in maximizing value for our clients whether with exposure, you know,

messaging, marketing, we can get the job done. As I said, I wanted to find out if you'd be interested in speaking to us about potentially selling your property off-market as I have several clients that would be very interested in your home. You can reach me at area code 310-780-0770. Again, I urge you to look up my track record, look us up, and if you're thinking of selling, please let us be your first call as we can get it done. 310-780-0770. Thanks very much. Have a great rest of your day. If you're already working with someone here at The Agency, then you're in great hands. If not, then I urge you to give me a call and look us up. Thanks very much. Have a great rest of your day. Bye now."[14]

89. Plaintiff Kern could tell the voicemail was pre-recorded because it begins with 2 seconds of dead silence before the sound of static begins and the message plays.

90. The message itself is generic and scripted, addressing the recipient broadly as "guys" rather than an individual name or title. The message remains generic throughout, as the agent is unsure whether the call recipient is already working with The Agency or not.

91. At no point does the voicemail contain any individualized details, such as the recipient's name, property address, street name, neighborhood details, or specific property characteristics. This is indicative of prerecorded messages broadly sent to multiple recipients simultaneously.

---

[14] https://www.dropbox.com/scl/fi/j1thpwfja52xqvywpcwtf/voicemail-35446668512.m4a?rlkey=4rtp8nzdfczv3y9ulwgm9kyre&dl=0

92. The voicemail length, approximately two minutes and forty-five seconds, is consistent with prerecorded marketing messages designed to broadcast promotional information at scale rather than individualized voicemail messages.

93. The voicemail repeatedly emphasizes promotional and marketing-oriented content, such as referencing The Agency's television show "Buying Beverly Hills" and broadly promoting the brokerage’s general services and notable agents, rather than a personalized solicitation.

94. The voicemail was left by Joey Parsi, a real estate agent who is licensed to work for UMRO Realty Corp, which operates using the d/b/a The Agency.

95. On October 23, 2025 at 12:02 PM, Plaintiff Kern received a 2nd unsolicited call to his cell phone from 310-780-0770.

96. This call was not answered, but a pre-recorded voicemail was left stating:

> “Hi there, this is Joey Parsi. I’m a real estate broker here at The Agency. I work in our Brentwood office. I work here alongside Santiago Arana, Mauricio Umansky, and Blair Chang here at The Agency. I’m calling you guys to see if you have had any thoughts of or consideration in selling your property. Let me explain why I ask. I’m working with several clients who are very interested in purchasing a home in the area. We have seen everything on the market, and so now I am taking the extreme measure of calling you individually to see if you’re thinking of selling. I’m not sure if you’re familiar with me and/or Santiago, or Mauricio Umansky. If not, I urge you to Google us. You’ll see and understand we’re the same group behind some of the most successful sales across Bel-Air, Beverly Hills, and the West-side. In fact, if you look at our prior and current listings you’ll see that we’ve helped achieve record results for our clients. By the way, many of whom are your friends and neighbors as I’ve mentioned. Anyway, if you’re thinking of selling, give me

a call. We can facilitate the sale for you on, or off-market and feature your property as our newest stand-out listing, just as we've done, as I said, for many of your friends and neighbors. You could reach me any time on my cell at area code 310-780-0770. Again, Joey Parsi, with The Agency, at 310-780-0770. Thanks very much. Look forward to speaking with you one way or the other. Thank you. Have a great rest of your day."

97. As with the previous voicemail, this voicemail sounds pre-recorded.

98. The voicemail begins with a few seconds of dead silence before the scripted, generic message is spoken out by Parsi.

99. The voicemail itself is addressed to a group of people, not an individual recipient. For example, Parsi states, "I'm calling you guys…"

100. In addition, the voicemail is open about being a cold call, as Parsi states that he is unsure if the recipient is familiar with him or The Agency.

101. The second voicemail exhibits the same pre-recorded characteristics: initial silence, identical generic scripting, use of plural "you guys," lack of personalization, and scripted length. The consistency between the two messages demonstrates use of the same pre-recorded message campaign.

102. Given that Joey Parsi operates under "The Umansky Team" brand and prominently invokes Mauricio Umansky's name and reputation in the prerecorded messages, it is reasonable to infer that Mauricio Umansky, as CEO and public face of the team, was aware of, authorized, or at minimum ratified the marketing practices employed by his direct subordinate, including the use of unauthorized prerecorded solicitations.

103. 310-780-0770 is the main phone number The Agency holds out to the public for Parsi:



[15]

104. Plaintiff Kern has never done business with The Agency or any of its real estate agents, including Parsi.

105. Plaintiff Kern has never provided his cell phone number to The Agency or any of its real estate agents.

106. The unauthorized prerecorded solicitation telephone calls that Plaintiff Kern received from or on behalf of Defendant The Agency have harmed Plaintiff in the form of annoyance, nuisance, and invasion of privacy, occupied his phone line, and disturbed the use and enjoyment of his phone.

107. Plaintiff Kern listened to the voicemails that he received from, or on behalf of the Defendant, just one of which is 2 minutes, 45 seconds in length. The other is nearly 2 minutes in length.

---

[15] https://www.theagencyre.com/agent/joey-parsi

108. Upon information and belief, The Agency receives a percentage of all commissions earned by its agents, including Joey Parsi. Any listing obtained through Parsi's cold calling activities, including the calls to Plaintiff, would generate commission income that The Agency retains. The Agency also benefits from the promotion of its brand even absent a sale. By maintaining Parsi as a licensed agent operating under its name and broker license while knowing of his cold calling practices, The Agency has accepted and retained the benefits of such conduct.

109. Seeking redress for these injuries, Plaintiff Kern, on behalf of himself and Classes of similarly situated individuals, brings suit under the TCPA.

## CLASS ALLEGATIONS

110. Plaintiff Kern brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and seeks certification of the following Classes:

> **Pre-recorded No Consent Class:** All persons in the United States who from four years prior to the filing of this action through class certification (1) the Defendant or an agent on Defendant's behalf called on their cellular telephone number (2) using an artificial or pre-recorded voice.
>
> **Do Not Call Registry Class:** All persons in the United States who from four years prior to the filing of this action through class certification (1) Defendant called more than one time, (2) within any 12-month period, (3) where the person's residential telephone number had been listed on the National Do Not Call Registry for at least thirty days, (4) to promote Defendant's services.

111. The following individuals are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2)

Defendant, its subsidiaries, parents, successors, predecessors, and any entity in which either Defendant or their parents have a controlling interest and their current or former employees, officers and directors; (3) Plaintiff's attorneys; (4) persons who properly execute and file a timely request for exclusion from the Classes; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) persons whose claims against the Defendant have been fully and finally adjudicated and/or released. Plaintiff Kern anticipates the need to amend the Class definitions following appropriate discovery.

112. **Numerosity and Typicality**: On information and belief, there are hundreds, if not thousands of members of the Classes such that joinder of all members is impracticable, and Plaintiff is a member of the Classes.

113. **Commonality and Predominance**: There are many questions of law and fact common to the claims of the Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

(a) Whether Defendant's conduct violated the TCPA;

(b) Whether Defendant placed calls to Plaintiff and members of the Pre-recorded No Consent Class without first obtaining consent to make the calls;

(c) Whether Defendant placed multiple calls within a 12-month period to Plaintiff and other consumers whose telephone numbers were registered with the DNC for at least 30 days of the time of each call;

(d) whether members of the Classes are entitled to treble damages based on the willfulness of Defendant's conduct.

114. **Adequate Representation**: Plaintiff Kern will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in class actions. Plaintiff Kern has no interests antagonistic to those of the Classes, and the Defendant has no defenses unique to Plaintiff. Plaintiff Kern and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and have the financial resources to do so. Neither Plaintiff Kern nor his counsel have any interest adverse to the Classes.

115. **Appropriateness**: This class action is also appropriate for certification because the Defendant has acted or refused to act on grounds generally applicable to the Classes and as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final class-wide injunctive relief appropriate. Defendant's business practices apply to and affect the members of the Classes uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Classes as wholes, not on facts or law applicable only to Plaintiff Kern. Additionally,

the damages suffered by individual members of the Classes will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the members of the Classes to obtain effective relief from Defendant's misconduct on an individual basis. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## FIRST CLAIM FOR RELIEF
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff Kern and the Pre-recorded No Consent Class)**

116. Plaintiff Kern repeats and realleges the prior paragraphs of this Complaint and incorporates them by reference herein.

117. Defendant transmitted unwanted telephone calls to Plaintiff Kern and the other members of the Pre-recorded No Consent Class using a pre-recorded voice message.

118. These pre-recorded voice calls were made *en masse* without the prior express consent of the Plaintiff and the other members of the Pre-recorded No Consent Class.

119. The Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's conduct, Plaintiff and the other members of the Pre-recorded No Consent Class are each entitled to a minimum of $500 in damages, and up to $1,500 in damages, for each violation.

**SECOND CLAIM FOR RELIEF**
**Telephone Consumer Protection Act**
**(Violation of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff Kern and the Do Not Call Registry Class)**

120. Plaintiff repeats and realleges paragraphs 1 through 115 of this Complaint and incorporates them by reference herein.

121. The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or his telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

122. Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" may bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c).

123. Defendant violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff Kern and the Do Not Call Registry Class members who registered their respective telephone numbers on the National Do Not Call Registry, a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal

government.

124. Defendant violated 47 U.S.C. § 227(c)(5) because Plaintiff Kern and the Do Not Call Registry Class received more than one call in a 12-month period made by or on behalf of the Defendant in violation of 47 C.F.R. § 64.1200, as described above.

125. As a result of Defendant's conduct as alleged herein, Plaintiff Kern and the Do Not Call Registry Class suffered actual damages and, under section 47 U.S.C. § 227(c), are entitled, inter alia, to receive up to $500 in damages for such violations of 47 C.F.R. § 64.1200.

126. To the extent Defendant's misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages recoverable by the members of the Do Not Call Registry Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

a) An order certifying this case as a class action on behalf of the Classes as defined above; appointing Plaintiff as the representative of the Classes; and appointing his attorneys as Class Counsel;

b) An award of actual and/or statutory damages and costs;

c) An order declaring that Defendant's actions, as set out above, violate the TCPA;

d) An injunction requiring Defendant to cease all unsolicited calling activity, and to otherwise protect the interests of the Classes; and

e) Such further and other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Kern on behalf of himself and the putative Classes, respectfully demands a trial by jury on all issues so triable.

**STEVEN KERN**, individually and on behalf of all others similarly situated,

DATED this 10th day of November, 2025.

By: /s/ *Rachel E. Kaufman*
Rachel E. Kaufman
KAUFMAN P.A.
237 S Dixie Hwy, Floor 4
Coral Gables, FL 33133
Telephone: (305) 469-5881
Email: rachel@kaufmanpa.com

*Attorney for Plaintiff and the putative Classes*